**Thomas E. WILSON, Appellant,**

v.

**Louise HAYES, Appellee.**

**No. 10–FM–263.**

District of Columbia Court of Appeals.

Argued Sept. 28, 2012.
Decided Oct. 10, 2013.

James L. Marketos, Washington, DC, for appellant.

Marjorie Just, Bethesda, MD, for appellee.

Before WASHINGTON, Chief Judge, THOMPSON, Associate Judge, and LONG, Senior Judge, Superior Court of

the District of Columbia.*

LONG, Senior Judge:

Appellant Thomas E. Wilson seeks relief from a 2010 judgment that he violated the terms of a Voluntary Separation, Support, Custody and Property Settlement Agreement ("Agreement") executed with his wife, appellee Louise Hayes. The parties had executed the Agreement in conjunction with their 1993 divorce. Appellee filed a complaint for breach of contract on February 15, 2002. This legal action largely focused upon appellant's contractual responsibilities for the educational expenses of the parties' children. After a five-day trial in 2003, the Hon. Odessa Vincent entered a judgment in favor of the appellee in a Memorandum and Order filed on January 21, 2010.

Before this court, appellant raises myriad issues regarding evidentiary rulings, as well as the trial court's interpretation of the Agreement and the imposition of an order to pay attorneys' fees. The pivotal issues on appeal are whether the trial court erroneously concluded that appellant breached the Agreement in two respects. The trial court determined that appellant breached the Agreement (1) by failing to pay the costs of his daughter's attendance at a certain secondary school, and (2) by satisfying his son's college expenses by withdrawals from a fiduciary account established for the son's benefit, instead of using his (appellant's) personal money. That fund had been created by appellant's parents under principles of a model statute commonly known as the Uniform Gifts to Minors Act ("UGMA").[1] Appellant was the trustee who controlled this account.

We affirm that portion of the trial court's judgment requiring appellant to pay appellee for their daughter's secondary school expenses. We reverse that portion of the judgment requiring appellant to pay his son (not the appellee) an amount of money equal to the UGMA withdrawals. Concluding that appellee had no standing to pursue one of the major claims triggering the fee award, we remand the case to the trial court for a fresh adjudication of the fee issue.

In order to provide a practical context for our analysis, we recapitulate certain historical facts about how the parties operated under the Agreement, why litigation erupted after the divorce, and how the trial court grappled with the claims and counterclaims. In doing so, we examine the interrelationship between and among certain provisions of the Agreement.

## I. Background of the Case

Thomas E. Wilson and Louise Hayes were married in the District of Columbia on April 12, 1975. They are the parents of two children, a son ("Z.H."), born August 6, 1980, and a daughter ("N.L."), born May 25, 1983. On June 18, 1993, the Superior Court issued to the parties a final decree of divorce. To settle the custody and economic matters in anticipation of divorce, Wilson and Hayes executed the aforementioned Agreement. The Agreement provided that the parties would have joint legal custody of their minor children and that they would share decision-making authority regarding important matters af-

---

* Sitting by designation pursuant to D.C.Code § 11–908(c) (2001).

1. This statutory scheme has been enacted in many states and the District of Columbia. Originally known as the "Uniform Gifts to Minors Act," the current version of this law in the District of Columbia is entitled, "The District of Columbia Uniform Transfers to Minors Act," codified at D.C.Code § 21–301 *et seq.* (2001). However, for ease of reference herein we use the acronym "UGMA," as it is found throughout the record.

fecting the children's education, health, and general welfare. The parties agreed that the children's primary residence would be with their mother.

The Agreement specified that, as long as he was able to do so, appellant would be financially "responsible for" the cost of private school and college education for the children. On this subject, the pertinent sections of the Agreement read as follows:

§ 5.5

The parties' children currently attend private schools. It is the parties' desire and intent that the children continue to attend private schools for grade school and high school. Provided that the Husband remains financially able to do so and that he continues to be of the opinion, after consultation with the Wife, that it is in the best interests of the children to remain in private schools, the Husband shall be responsible for payments of all costs associated with such private education, including tuition, books, and fees assessed by the school. The Husband's decision shall be final and not subject to mediation.

§ 5.6

If the Husband consents to the child's choice of a college, he shall be responsible for the following expenses incurred in connection with each child's pursuit of an undergraduate college degree: tuition, room and board, books, fees assessed by the school, and travel to and from school. In the event that the Husband does not agree with the selection, he agrees to contribute an amount equal to the cost of tuition, room and board, books, and fees for attendance at the University of Maryland or other comparable state institution as an in-state resident. The Husband's consent shall not unreasonably be withheld.

In the years subsequent to the divorce, the parties disagreed on virtually every decision regarding their children's education. They were sometimes at odds over the nature and extent of appellant's obligation to pay for the children's schooling, though neither party disputed that appellant was always financially able to pay. Communications between the parties became extremely strained, and as a result, they discussed matters primarily in writing. Though the disputes were many, we need not repeat the entire history of each flare-up. Instead, we summarize below the essential events that inform the issues on appeal.

### A. The Daughter's Attendance at The Academy at Swift River

N.L. had been attending the Connelly School of the Holy Child, a private school, until December 1999, when the school advised her mother that N.L. would not be allowed to return for the spring semester. Appellee suggested that N.L. attend Woodrow Wilson High School, a public school in the District of Columbia. However, appellant objected to N.L. attending a public school. When the parties were unable to come to an agreement before the beginning of the new term, appellee enrolled N.L. at Woodrow Wilson High School in January 2000. In the meantime, the parties continued to discuss their daughter's educational placement.

In July 2000, at appellant's request, the parties visited the Family Foundation School ("FFS"), a private school. Appellant believed that FFS provided the structure that N.L. needed, while appellee thought that the FFS program would not be constructive for their daughter. The parties could not come to an agreement. Knowing this, appellee made a refundable deposit to secure a spot for her daughter at FFS.

Shortly thereafter, appellee arranged a tour of The Academy at Swift River ("ASR"), a private residential school. Although she notified appellant of the tour, he was unable to attend. Appellant eventually learned about ASR via Internet research and a conversation with an ASR administrator. Nonetheless, appellant disapproved of ASR as a placement for N.L. The parties discussed N.L.'s options, but they still could not reach a joint decision as to which school she should attend.

The parties briefly explored mediation to resolve the issue. Appellee suggested that they meet with the child's godfather (an experienced attorney) but appellant objected to her choice of mediator. Without consulting appellee, appellant then scheduled mediation with Dr. Edward Beal. Appellee was out of town on the scheduled mediation date, but she told appellant that she would be willing to meet with Dr. Beal at another date. Neither party proposed another mediation date, and neither party proposed new mediators. The parties did not explore mediation any further.

Meanwhile, appellee signed a tuition agreement with ASR, and N.L. began attending the school in August 2000. Upon learning of this, appellant announced that he would not pay for the cost of N.L.'s education at ASR, citing Sections 5.5 and 5.6 of the Agreement. Appellant maintained that he was not required to pay the costs of his daughter's education at a school that the parties had not jointly selected. Through a combination of loans and her personal funds, appellee personally paid the costs of N.L.'s attendance at ASR.

Appellee took no further action to force appellant to pay for N.L.'s schooling until August 2001. At that time, she sent ASR invoices to appellant along with a letter from her counsel, demanding payment pursuant to the terms of the Agreement. Appellee testified at trial that she had delayed seeking payment from appellant only because the parties' inability to communicate had caused her great distress. She had decided to focus on N.L.'s education first and to seek reimbursement later. Appellant persisted in claiming that he had no obligation to pay for his daughter's education at ASR.

Furthermore, costs for group therapy sessions were included in N.L.'s tuition bills. Those sessions were a component of the curriculum developed for N.L. at ASR. The group therapy cost was not covered under appellant's insurance plan. Although appellee insisted that he was required to pay the cost of therapy as an unreimbursed medical expense, appellant disagreed that he was so obligated under the terms of the Agreement. Appellant insisted that group therapy was not medical treatment, and even if it could be considered medical treatment, he was entitled to advance notice of such an expense under the Agreement. Because he had not received such advance notice, appellant refused to pay any of the ASR expenses.

## B. The Son's Attendance at Georgetown University

In April 1998, Z.H. chose to attend Georgetown University, a decision supported by both of his parents. When Z.H. enrolled at Georgetown in August 1998, appellant remitted payments for all of the expenses associated with his son's education. After receiving low grades in his first semester, Z.H. decided to take a leave of absence. When Z.H. informed his father that he wished to resume his studies at Georgetown in August 1999, appellant refused to pay the costs, citing his son's prior poor performance. Instead, he proposed that Z.H. pay his own college expenses up front and promised to reimburse

him later, if he obtained a grade of B or better in each course. Z.H. agreed to this so-called father-son "scholarship" arrangement.

Appellee opposed this plan and implored appellant to pay for Z.H.'s college expenses pursuant to his obligation under the Agreement. When appellant refused, appellee assisted Z.H. in obtaining a loan from the Sallie Mae Corporation. Following the end of each semester in which Z.H. received satisfactory grades, appellant paid to Sallie Mae an amount that he deemed equivalent to Z.H.'s college costs. After one year of this arrangement, appellant agreed to pay his son's college expenses at the beginning of each semester, and he paid Z.H.'s expenses for the fall 2000 semester directly to Georgetown University when they became due. Z.H. decided to take a second leave of absence after the completion of that semester. Thereafter, appellant did not pay any further college expenses for Z.H.

In January 2001, appellee learned that appellant had used funds from the UGMA account to pay for their son's two years at Georgetown University. The Agreement contains no mention of the UGMA account, though both parties had been well aware of its existence before they executed the Agreement.

In her complaint, appellee claimed that appellant's use of the UGMA funds to pay for Z.H.'s college expenses constituted a distinct breach of Section 5.6 of the Agreement because appellee was designated therein as the parent "responsible for" college expenses. Appellant disagreed, weaving together a number of arguments at various points in this litigation. He emphasized (1) that the UGMA fund was established for the purpose of defraying the cost of Z.H.'s education, (2) that both parties were aware of the existence of the UGMA account when the Agreement was signed, (3) that the parties did not negotiate anything concerning the account, (4) that the parties did not reference the account anywhere in the contract, and (5) that his obligation under Section 5.6 was premised upon his having access to the UGMA funds.

Prior to trial, appellant paid the remaining balance on the Sallie Mae loan and reimbursed appellee for interest that she had paid on the loan. Thus, there was no dispute at trial regarding any unpaid balance. The only issue that remained for trial regarding Z.H.'s college expenses was the contractual legality of appellant's use of the UGMA funds.

### C. The Essential Proceedings Below

In her action for breach of contract, appellee alleged that appellant had breached Sections 5.5 and 5.6 of the Agreement by (1) failing to pay the cost of N.L.'s attendance at ASR, including the cost of group therapy sessions, and (2) failing to pay from his own assets the cost of Z.H.'s attendance for four semesters at Georgetown University.

In his answer to the complaint, appellant denied the material allegations of the complaint and raised numerous affirmative defenses. We will not repeat those of a boilerplate nature. However, the substantive defenses were: (1) that appellee's breach of the co-parenting provision of the Agreement (Section 4.1) excused his failure to pay his daughter's ASR expenses; and (2) that appellee lacked standing to assert a claim on Z.H.'s behalf regarding the UGMA account.

Appellant also asserted several counterclaims. One, appellant charged that appellee had materially breached Section 4.1 of the contract by failing to share parental responsibilities, unilaterally making important decisions relative to N.L.'s health,

education, and general welfare. Section 4.1 of the Agreement states:

> The parties shall have joint legal custody of their minor children. This means that important parental decisions affecting the children's education, health and general welfare shall be made jointly by the parties and that parental responsibilities shall be shared. The parties agree to advise one another regularly on all significant matters related to the children's health and general welfare and to keep one another informed of the progress of their education. Both parents shall have the right to be informed of and participate in conferences with the children's teachers, physicians or other such professionals. Each parent shall have full access to the children's school and health records.
>
> Notwithstanding the above, each parent acting alone shall have the authority to consent to emergency medical treatment for the children. In such an emergency, the parties shall consult with each other if feasible.

Two, appellant complained that the appellee had wrongfully refused to mediate their disputes regarding the parenting of N.L., in violation of Section 13.1 of the Agreement. That portion of the Agreement states:

> If the parties are unable to agree on any matter related to this Agreement, they shall, at the request of either party, participate in mediation with a mutually agreed upon mental health professional or mediator. The costs of mediation shall be shared equally.

Three, appellant alleged that his former wife had improperly incurred debts on his behalf by unilaterally enrolling N.L. at ASR, expecting him to pay for such. Appellant alleged that this was a violation of Section 12.2 of the Agreement, which provides, "Except as expressly set forth in this Agreement neither party shall incur any expenses on behalf of the other, nor pledge the other's credit."

The judge who originally presided over this case was the Hon. Linda K. Davis. In a pre-trial discovery order, Judge Davis disallowed some of appellant's requests for admissions propounded to the appellee. Some of the disallowed requests related to sensitive information that appellee had not shared with him regarding N.L.'s health and welfare.[2] Other disallowed requests for admissions focused on appellee's highly personal social habits and matters that occurred far in the past.[3] Judge Davis determined that the objectionable discovery requests were simply not relevant to the litigation of the claims. When the case went to trial, Judge Vincent adhered to Judge Davis' earlier ruling and did not permit appellant to offer any evidence on the matters embraced in the disallowed requests for admissions. As a practical matter, this meant that appellant could not force appellee to submit responses to the disputed requests for admissions and then introduce such admissions as evidence (assuming that facts were admitted as he had phrased them).

Judge Vincent entered judgment in favor of appellee on each of her claims and

---

**2.** In our view, it would not be appropriate to divulge publicly the nature of this child's medical issues and the related personal welfare issues. The narrative details do not drive our disposition of the appeal from the trial court's ruling.

**3.** For our purposes, it is unnecessary to recount the details of appellee's alleged social habits, except to say that such matters evolved subsequent to the parties' separation. Also, appellant appears to have based the disputed discovery requests on his personal suspicions or interpretations of matters that occurred outside of his presence.

ordered appellant to pay her $78,972, the cost of N.L.'s attendance and group therapy sessions at ASR, and to reimburse Z.H. (not the appellee) the sum of $72,046.16, the amount which appellant had withdrawn from the UGMA account and applied toward Z.H.'s college expenses.

As to the first part of the money judgment, Judge Vincent reasoned that appellant was obligated to pay the costs of his children's private school education under Section 5.5 of the Agreement unless he was financially unable to do so or unless he no longer believed that his children should attend private schools. Since neither of those conditions existed when N.L. began attending ASR, Judge Vincent concluded that appellant was liable for all of his daughter's ASR expenses. This liability included the expense of group therapy, which was a part of N.L.'s curriculum at ASR.

Regarding the UGMA funds, Judge Vincent concluded that appellant had misused the UGMA account by using such money to pay Z.H.'s college expenses. Under Judge Vincent's interpretation of the Agreement, the language in Section 5.6— that appellant would be "responsible for" the costs of his children's college education—required him to pay such costs literally from his personal funds.

Judge Vincent also rejected all of the appellant's counterclaims. Judge Vincent declined to find that appellee had breached Section 4.1 of the Agreement. This ruling was based on Judge Vincent's conclusion that the parties simply "suffered from a fundamental inability to communicate" and that appellee had made reasonable efforts to keep appellant informed about important matters related to their children.

Finally, pursuant to an indemnity provision in the Agreement, Judge Vincent ordered appellant to pay all of appellee's legal fees and costs, totaling $110,342.91.

## II. Analysis of Appellant's Contentions on Appeal

Appellant raises three main issues on appeal: (1) whether the trial court erroneously declined to interpret Section 4.1 of the Agreement to engraft onto Section 5.5 the obligation of appellee to obtain appellant's agreement in the choice of a particular private school for their children; (2) whether the trial court erroneously concluded that appellant breached Section 5.6 of the Agreement by not paying Z.H.'s college expenses from appellant's personal assets; and (3) whether the trial court abused its discretion in curtailing the scope of evidence that appellant was permitted to present regarding his counterclaims. We affirm the trial court's denial of appellant's counterclaims and the related evidentiary rulings. We also affirm the trial court's finding that appellant was required to pay his daughter's ASR expenses, as appellant's consent to the choice of private school was not a pre-condition to his financial obligation under Section 5.5. However, we reverse the trial court's judgment requiring appellant to reimburse Z.H. for the funds expended from his UGMA account. We find that the Agreement contains no requirement that appellant use only his personal funds to pay for Z.H.'s college expenses and that he did not breach Section 5.6 in using the UGMA funds for that purpose. Further, since appellee had no personal interest in the UGMA account and merely purported to assert her son's interest, we hold that she had no standing to do so. For this reason alone, this portion of the judgment cannot stand.

We begin by assessing the issues regarding both parts of the money judgment in favor of the appellee. In that context, we add our analysis of the rejection of the counterclaims.

## A. Appellant's Obligation to Pay the ASR Costs

■ Appellant contests the trial court's conclusion that he is obligated, pursuant to Section 5.5 of the Agreement, to pay the expenses of his daughter's attendance at a private secondary school whose selection he opposed. The trial court's interpretation of the Agreement is a question of law which we review *de novo. Steele Foundations, Inc. v. Clark Constr. Group, Inc.,* 937 A.2d 148, 153 (D.C.2007). We find that appellant relies on a mistaken view of contract interpretation. Appellant contends that the joint decision-making and mediation requirements of Sections 4.1 and 13.1 engraft onto Section 5.5 the requirement that he agree to the choice of a particular private school before he can be required to pay a school's assessments. The trial court correctly dismissed this argument because it is inconsistent with the plain language of the contract.

■ As Judge Vincent explained, Section 5.5 of the Agreement is clear and unambiguous. Appellant's obligation to pay for his children's private secondary schools was conditioned on (1) his financial ability to pay, and (2) his continued belief that it was in the children's best interest to attend private schools. Neither party disputed that these conditions had been satisfied when N.L. began attending ASR, and the trial court found that appellant's obligation to pay the expenses associated with her attendance at ASR was therefore plain. The trial court reasoned that the final sentence of Section 5.5, that "[t]he Husband's decision shall be final and not subject to mediation," refers only to his preference for private schools generally, as opposed to public schools, and not to his preference for a specific private school. The Agreement contains no requirement for appellant's consent to the selection of a particular private school.

In his brief and during oral argument, appellant insisted that reading Section 5.5 in isolation would deprive him of the only benefit that he gained under the Agreement, which was a right to share in important parental decisions. Properly understood, appellant contends, Section 4.1 engrafts a third condition onto Section 5.5, *i.e.,* a joint decision with regard to the choice of school. Under appellant's interpretation of the Agreement, the parties were required to mediate any disagreement over private school selection pursuant to the mediation provision of Section 13.1.

■ Appellant urges us to hold that in the absence of mediation, his refusal to pay for private school expenses pursuant to Section 5.5 could not be a considered a breach. We disagree. Our *de novo* review of the Agreement leads us to the same conclusion reached by the trial court. We interpret a contract as a whole, giving effective meaning to all of its terms. *Malik Corp. v. Tenacity Group, LLC,* 961 A.2d 1057, 1060 (D.C.2008). Yet, this approach does not permit us to read one provision of a contract as altering the plain meaning of another. *Dodek v. CF 16 Corp.,* 537 A.2d 1086, 1096 (D.C.1988). Despite the parties' general agreement to share decision-making about the education, health, and general welfare of the children embodied by Section 4.1, Section 5.5 is a stand-alone provision whose internal content is totally at odds with a requirement of joint selection of private schools. The conditions under which appellant is required to pay for the children's private school education are clear and complete, and we will not impose additional requirements above those that the parties negotiated themselves. That the parties could have negotiated otherwise is quite evident, as Section 5.6 specifically conditions appellant's financial obligations with regard to

the children's college expenses on his consent to their choice of school.[4] The parties could have negotiated a similar condition regarding secondary schools, but they simply did not do so.

■ Because appellant did not assert that he could not afford to pay for N.L.'s attendance at ASR or that he objected to her attendance at a private secondary school, he was fully obligated to pay all costs of N.L.'s attendance at that school. Without question, appellant's financial obligation included the cost of group therapy, which was a part of the curriculum developed for N.L. at ASR. Under Section 5.5 appellant was required to pay the "fees assessed by the school." The group therapy sessions were itemized on the bills from ASR. Therefore, they were collectively a fee "assessed" by ASR.[5]

■ Finally, we must reject another theory of the appellant as to why he had no responsibility for the ASR expenses. On previous occasions, appellee offered to share N.L.'s educational expenses when the parties failed to agree on a secondary school placement. Appellant argues that such offers were evidence of the parties' mutual understanding that he could not be required to pay if no joint decision was reached. Appellee testified at trial that she chose, at first, not to enforce the Agreement in those situations in an attempt to reduce the acrimony between the parties. Yet, appellant contends that the parties modified appellant's obligations under Section 5.5 through appellee's "course of conduct" under the Agreement.

Section 17.1 of the Agreement specifically provides, "Any modification, waiver or amendment of any of the terms of this Agreement shall not be effective unless in writing executed with formality equal to that of this Agreement." There is no evidence whatsoever that any modification was formalized, despite appellee's early hesitance to enforce Section 5.5. The language of Section 5.5 is unambiguous; a written waiver or modification is required. Thus, because of the absence of such a writing, the trial judge correctly enforced Section 5.5 by entering a judgment against appellant for $78,972.00.

### B. Appellant's Obligation to Pay Georgetown Costs from Personal Funds

As to the cost of Z.H.'s attendance at Georgetown University, appellant does not dispute that he was required to guarantee payment. Nonetheless, he contests the trial court's conclusion that he was required to use only his personal assets to meet this obligation. Appellant disputes that he breached Section 5.6 of the Agreement by exercising his fiduciary authority to use the UGMA account. He also argues that the trial court's imposition of "specific performance" lacked any legal foundation, for several reasons. We agree that this money judgment as well as the order of specific performance must be reversed. Our conclusion rests on two points, *i.e.*, that the record does not contain facts sufficient to support the remedy of specific performance of a contractual obligation, and that appellee does not otherwise have standing to demand return of the UGMA disbursements to her adult son, a non-party to this suit.

---

4. Section 5.6 states, in pertinent part, *"If the Husband consents to the child's choice of a college,* he shall be responsible for the following expenses incurred in connection with each child's pursuit of an undergraduate college degree ... "* (emphasis added).

5. We agree with the trial court that whether the group therapy sessions were covered by appellant's health insurance plan was irrelevant.

*Appellee's Theory of Liability for Breach of Contract.* In the complaint, appellee specified why she deemed the use of the UGMA funds to be a breach of the Agreement. She pointed to the requirement in Section 5.6 that the appellant would be "responsible" for paying the costs of his son's attendance at college. She contended that the UGMA funds belonged to Z.H. when he attained the age of 18 (the age of majority in the District of Columbia) and that any subsequent disbursements from the account were an improper use of the child's money for his father's obligation. All of the appellant's disbursements from the account were made after Z.H.'s 18th birthday. Appellee wrote, "Defendant should be required to pay [Z.H.'s] college expenses, as required by the Agreement, and to reimburse plaintiff for *her* damages resulting from his breach of the Agreement." Complaint at ¶ 24 (emphasis added).

Before the trial court, the parties sparred over whether the turnover age for this investment account was the age of 18 versus the age of 21.[6] We have determined, however, that the underlying merits concerning use of the account are not necessary to our disposition of this appeal, which is that the judgment regarding the UGMA disbursements must be reversed for lack of standing. Therefore, we do not digress to determine whether appellant violated any statute in using the UGMA funds.

*The Trial Court's Ruling.* Despite the fact that the appellee's complaint did not contain a demand for money damages for Z.H., this is precisely what the trial judge

awarded in the judgment. In retrospect, the trial court's articulation of appellant's liability to Z.H. reflected an erroneous use of the idiom of "specific performance."

To justify the award of money damages to Z.H., the trial judge wrote the following:

> The agreement, as it pertained to the defendant's obligation to pay for [Z.H.'s] college education, was made for the benefit of [Z.H.]. Thus, [Z.H.] may be characterized as a third-party donee beneficiary [*sic*]. The plaintiff here may enforce the agreement and seek damages.... As the Georgetown University costs have already been paid, the defendant *cannot specifically perform by paying the Georgetown University costs from his personal funds.* However, the defendant may still specifically perform as was required under the agreement by returning the misappropriated funds to their rightful owner, *i.e.,* replace the misappropriated funds with his personal funds.

Memorandum and Order at 20–22 (emphasis added).

The judgment herein contains two parts that relate to the UGMA episode: a money judgment in favor of Z.H. and an order of specific performance as a remedy for breach of contract. To untangle why neither remedy was justified, we address the details of how specific performance is designed to operate, why it had no proper place in the judgment, and why the appellee had no standing to demand judgment for Z.H.

---

**6.** Appellant believed that the turnover age was 21 because his parents had established the investment account in Mississippi, where the age of majority was then 21 years of age. However, appellee insisted that the age issue was not important because the Codes of both Mississippi and the District of Columbia pro-

vide that a payment or disbursement from a UGMA account is "in addition to, not in substitution for, and does not affect any obligation of a person to support the minor." D.C.Code § 21–314(c) (2001); Miss.Code Ann. § 91–20–29(3) (2011).

*Lack of Evidentiary and Legal Basis for Imposing Specific Performance.* We address the multiple ways in which specific performance was injected into the trial court's decision and the terms of the judgment.

■ The well-established elements necessary to impose the remedy of specific performance are: "(1) a valid binding contract; (2) definite and certain terms; (3) mutuality of obligation and remedy; (4) freedom from fraud and overreaching; and (5) lack of remedy at law." *Drazin v. American Oil Co.,* 395 A.2d 32, 34 n. 3 (D.C.1978) (citing *Shreeve v. Greer,* 65 Ariz. 35, 173 P.2d 641, 644 (Ariz.1946)). Three of these elements are missing from the trial evidence herein.

■ *Lack of Definite and Certain Terms.* Specific performance is literal. Without question, specific performance "is a remedy that compels the performance of the contract in the *precise terms* agreed upon." *Drazin, supra,* at 34 (emphasis in original). On its face, the Agreement contains no specific requirement that appellant use only his personal funds to pay for Z.H.'s college expenses.

Appellee has inflated the importance of the phrase in Section 5.6, stating that Wilson would be "responsible for" the children's college expenses. She casts this phrase as the linchpin to forcing appellant to pay to Z.H. the amount expended from the UGMA account. Yet, the silence about the UGMA funds in the Agreement is conspicuous. Whether or not the UGMA account had ever existed, the parties could have negotiated a specific source of funding for college expenses, such as particular certificates of deposit or investments. They did not do so. We cannot insert or assume missing elements of the Agreement as a *post hoc* rationalization of what the parties might have done, but failed to do.

On this record, it was clearly erroneous for the trial judge to conclude that appellant breached Section 5.6 of the Agreement. We agree with appellant that the source of funding Z.H.'s college expenses was immaterial, so long as the party who insured payment was the appellant and not the appellee. The Agreement purported only to establish and govern the respective rights of the parties as against each other as divorcing spouses. Having produced no evidence to the contrary, appellee failed to carry her burden of proof as to breach of Section 5.6.

■ *Lack of Mutuality of Obligation.* At trial, there was no proof of a mutual intent to bar appellant's use of the UGMA account. Significantly, both parties were well aware of the existence of the UGMA account prior to executing the Agreement. The trial court noted in its findings that appellant's parents opened this account when Z.H. was born, in 1980. Thereafter, the money had always been in a Franklin Templeton Fund securities account, with appellant as the sole custodian. Since the account had been established while the marriage was intact, the potential burden of paying for educational expenses would have been of interest to both parties. Appellee does not even claim that she asked appellant to forego resort to the UGMA funds. The nature of this custodial account was too important to be waived by anything other than a signed writing. Thus, if the parties actually—and mutually—had intended the Agreement to regulate those funds, the Agreement would recite this intent.

The parties failed to include any mention of the UGMA funds in the Agreement, despite the assistance of their respective attorneys. Yet, from this silence, appellee still argues that appellant was contractual-

ly prohibited from using the UGMA funds. We disagree.

The mutual nature of contractual promises must be clear on the face of the contract. Appellant's trial testimony totally belied any mutual intent to forbid the use of the UGMA funds. He testified that he used his own funds to pay for his son's primary and secondary education, specifically opting to conserve the UGMA funds for college expenses. He emphasized that having access to the UGMA account was "critical" to him in granting consent for Z.H. to attend Georgetown University "because it was one of the most expensive colleges in the country." He added that he would not have consented to Z.H.'s attendance at Georgetown if he had not anticipated having access to the UGMA funds. Appellee offered no testimony or other evidence of her own to rebut the appellant's testimony. The evidence of his personal intent and the absence of any waiver of his fiduciary authority were unchallenged. Thus, there was no proof of *mutual* intent to exclude the use of the UGMA account.

The trial court failed to explain in her factual findings why the un-rebutted testimony of the appellant was not credible or sufficient to debunk the notion of a *mutual* understanding. The judge simply ignored appellant's testimony for no articulated reason. Overall, this approach fatally undermined this portion of the judgment.

*Existence of a Remedy at Law.* Specific performance is an equitable remedy that is available only when a claimant has no remedy at law. The classic "remedy at law," of course, is money damages. Here, the trial court conflated the award of damages with the novel idea of "returning" the "misappropriated funds" as a form of specific performance. In her written decision,

the trial judge grudgingly recognized that specific performance has no place in this case because appellant had paid the Georgetown bills. Appellant's contractual obligation to insure the payment of the college costs had been satisfied (albeit in a scenario that was unanticipated). By the time of trial, the payment issue was moot. Yet, this fact did not stop the trial judge from imposing an order for specific performance anyway.

The fact that the trial court awarded money damages surely meant that specific performance could not be imposed to address the same injury. A plaintiff cannot have it both ways, *i.e.* to obtain specific performance as well as money to compensate for the same breach of contract. The reason why specific performance and money damages are mutually exclusive is obvious. An order of specific performance is designed to force a party to perform a contractual obligation that remains outstanding, *i.e.*, un-fulfilled and still owing. It is not designed to bludgeon a party into re-enacting the performance in a different way or by a new methodology that the plaintiff would have preferred.

 *Appellee's Lack of Standing.* Even if the Agreement had included an express waiver or bar to appellant's use of the UGMA funds, a breach of that provision could not have injured the appellee. She expended no funds of her own to pay the Georgetown bills. In demanding a money judgment payable to Z.H., the appellee effectively sought damages on behalf of another adult. Transparently, she had no standing to make this financial claim. Several facts illuminate appellee's lack of standing.

 First, Z.H. had reached the District of Columbia age of majority before appellant expended these funds.[7] By that

---

**7.** The age of majority in the District of Columbia is 18 years. D.C.Code § 46–101 (2001).

time, any claim for damages attributable to improper disbursements would have been a cause of action belonging only to Z.H.[8] There is no evidence that Z.H. lacked the legal capacity to file suit on his own, and appellee has never asserted that he did.

Second, appellee failed to establish her own legal basis for pursuing Z.H.'s claim. She did not have the status of a fiduciary for Z.H., and never claimed that Z.H. was afflicted with any incapacity calling for a "next friend," conservator, or attorney-in-fact to file suit on his behalf.

Furthermore, appellee did nothing to bring Z.H. before the court under applicable procedures for joining him as a party. Finally, Z.H. personally never took any steps to intervene.

Black letter law precludes a promisee to a contract from obtaining a judgment on behalf of a third party beneficiary for anything other than specific performance. The Second Restatement on Contracts provides, in pertinent part:

> Even though a contract creates a duty to a beneficiary, the promisee [Hayes, in this case] has a right to performance. . . . The promisee *cannot recover damages suffered by the beneficiary,* but the promisee is a proper party to sue for specific performance *if that remedy is otherwise appropriate* . . . .

RESTATEMENT (SECOND) OF CONTRACTS § 307 (emphasis added) (citations omitted).

For all of the reasons set forth above, the remedy of specific performance and the award of damages to Z.H. were both unsupportable as a matter of law. As a result, the judgment of specific performance and the related order to reimburse Z.H. the sum of $72,046.16 must be *reversed.*[9]

## C. Rejection of Appellant's Counterclaims and Affirmative Defenses

We need not address the fate of defenses and counterclaims that relate only to the UGMA issue on which the appellant prevails in this Court. We examine only the arguments briefed regarding defenses and counterclaims tied to the ASR payments.

The trial court did not make rulings on all of the affirmative defenses. In fact, the trial judge wrote only on the subject of laches. Appellant complains in his brief, "Space does not permit discussion of each such affirmative defense the court failed to consider." Consequently, with appellant choosing not to include arguments regarding other defenses, we focus only on the defense of laches.[10] Furthermore, appellant appears to seek relief in this Court on only three of the numerous counterclaims, *i.e.,* Counterclaim I, II, and III. In reviewing the trial court's treatment of those counterclaims, we consider whether the disputed evidentiary rulings were a particular source of error.

*Counterclaim I (Appellee's Breach of Sections 4.1 and 13.1 of the Agreement).* Section 4.1, quoted in full already, contains

---

Z.H. turned 18 on August 6, 1998. Appellant first withdrew funds from the UGMA account on March 10, 2000.

8. "A third party may sue on a contract if the contracting parties intended the third party to benefit." *District of Columbia v. Campbell,* 580 A.2d 1295, 1302 (D.C.1990).

9. To be clear, nothing herein has any preclusive effect on a potential civil action that may be filed by the son against his father with regard to the turnover of the UGMA funds. Any such action would have to proceed on its own merits, including, but not limited to applicable timeliness requirements and any other relevant legal principles.

10. Some of the defenses related only to the UGMA account, and others were not explicitly briefed as appeal issues.

the requirement that each party will keep the other informed about significant health, education, and welfare issues regarding each child. Section 13.1 called for the parties to mediate any disagreements on this subject and others. In this counterclaim, appellant cataloged what he described as "repeated" failures of appellee to include him in decisions to enroll N.L. in various schools throughout N.L.'s childhood. He described how appellee failed to inform him of a list of medical and personal crises that beset N.L. (particularly during the child's early teenage years). He adds to this his gripe about being billed for the ASR costs. Indeed, he sought reimbursement for all that he had paid to ASR.

▆▆ *Trial Court's Findings Regarding Hayes' Breach of Section 4.1.* On this record we cannot find that the trial court abused her fact-finding discretion in deciding that appellee did not materially breach the Agreement. Appellant did not carry his burden of proving that the breach was material. We emphasize the concept of materiality, because although a former spouse might not be uniformly forthcoming about child-related information, proof of a breach of a formal contract can be a nuanced debate. Cases of this nature do not have twins; they are all fact-bound. On any given trial record, the judge must decide what was truly damaging to the complaining parent's role, even where non-frivolous information was not provided by the other parent.

▆▆ Whether a breach of contract is "material" is an issue of fact. *Malik Corp. v. Tenacity Group, LLC,* 961 A.2d 1057, 1061 (D.C.2008). The trial court's findings of fact will not be set aside unless they are clearly erroneous or lack supporting evidence. D.C.Code § 17–305(a) (2001). This is necessarily a heavy burden, as we do not lightly disturb a trial court's factual findings. Because appellant has failed to

show that the court's findings regarding the credibility, weight and persuasiveness of the competing evidence were clearly erroneous, we decline to do so here.

Appellant broadly argues that appellee's allegedly dismissive communications or lack of communication were "erroneously ignored or excused." We find no indication of error in this conclusory assertion. The record supports the trial court's findings that joint parenting was extremely difficult for these parties and that appellee did her best under the circumstances to keep appellant informed and involved.

▆▆ Clearly, a trial judge sitting as finder of fact is in the best position to observe and weigh the demeanor of the witnesses and form a conclusion as to credibility. *Poole v. United States,* 929 A.2d 413, 415 (D.C.2007). We will uphold the trial court's weighing of the evidence and resolution of conflicts in testimony. *Auxier v. Kraisel,* 466 A.2d 416, 418 (D.C.1983)

Here, the trial judge was well situated to discern whether appellee's behavior reflected a sincere attempt to comply with the Agreement. Moreover, the trial court was able to see the full sweep of events and to determine whether the appellee realistically breached the Agreement when the ability to communicate was exhausted. In her memorandum opinion, Judge Vincent found that the parties "simply could not communicate with each other." This finding was supported by the testimony of both parties, who offered vastly different accounts of their interactions. Despite their extreme animosity towards each other, the parties engaged in many discussions about their children's education (primarily in writing) and attempted to reach consensus on a placement for N.L.

A parent cannot ignore a contractual obligation to keep the other parent informed on important child-rearing matters

simply because of ordinary bickering between them. But in this case, any failure that may have occurred as to the sharing of parental responsibilities could fairly be ascribed to both parties. This was the realistic essence of the trial court's findings.

It is true, for example, that appellee acted without appellant's consent when she enrolled N.L. in Woodrow Wilson High School and then at ASR. However, the trial court found that when the parties could not reach a joint decision regarding N.L.'s educational placement before the beginning of a new term, it was reasonable for appellee to act in what she believed were her daughter's best interests. Appellant can hardly assert that N.L. would have been better off had she not been enrolled in *any* school at all while her parents continued to joust with each other. To this day, appellant has never identified what appellee should have done in the absence of his express agreement to a particular school placement.

Overall, it was not clearly erroneous to conclude that appellee did not materially breach Section 4.1 of the Agreement by depriving appellant of the opportunity to co-parent on certain issues at certain times.

■ *Trial Court's Findings Regarding the Failure to Mediate.* Where the failure to mediate is concerned, we similarly will not reject the trial court's conclusion that appellee did not materially breach Section 13.1. The record clearly demonstrates that both parties failed to insure compliance with the mandatory mediation provision of the Agreement. After consenting to meet with Dr. Beal, neither party made any attempt to schedule mediation at a mutually-agreeable time, nor did they explore other possible mediators. They were mutually at fault for allowing mediation to collapse. On these facts, appellant

failed to carry his burden of proving this particular, alleged breach of the Agreement.

■ *Evidentiary Rulings as Affecting the Counterclaims.* Appellant contends that he was prejudiced by his inability to present evidence probative of his counterclaims as a result of Judge Davis' pre-trial discovery order and Judge Vincent's adherence to that decision at trial. The trial court's discovery and evidentiary rulings are reviewed for abuse of discretion. *In re Moses,* 659 A.2d 829, 831 (D.C. 1995); *Roberts–Douglas v. Meares,* 624 A.2d 405, 415 (D.C.1992). Appellant asserts that these rulings prevented him from "proving the gravamen of his counterclaims"—specifically that appellee breached Section 4.1 of the Agreement. He has failed to persuade us that these rulings constituted abuses of discretion.

Consistent with Judge Davis' pre-trial ruling, Judge Vincent barred appellant from presenting evidence of appellee's non-disclosures regarding N.L.'s health and welfare at trial, finding that such evidence regarding sensitive aspects of their daughter's life was not relevant to the case. Appellant claims that this ruling was an abuse of discretion.

Having made our own review of the record, we are convinced that appellant had a fair opportunity to litigate his claims regarding appellee's alleged breaches of the Agreement. In essence, appellant complains that appellee prevented him from co-parenting by denying him access to information about what was going on in his daughter's life. At trial, both parties presented evidence regarding the course of their relationship after their divorce and the exchange of information related to their children. Appellee testified as to how she had arranged for the children's schools to correspond directly with appel-

lant and include him in conferences and how she attempted to discuss matters related to N.L.'s education and welfare with him. On cross-examination, appellant's counsel elicited an acknowledgment from the appellee that she failed to disclose to appellant certain facts regarding N.L.'s medical issues and emotional well-being and that she made decisions about dealing with those matters without appellant's input. In his testimony, appellant offered his own perceptions of appellee's deficiencies in communications regarding N.L.

However, despite his protestations, appellant has failed to articulate on appeal any palpable connection between the evidentiary rulings and the result of the trial. We say this because the crux of what was contained in the excluded evidence was already in the record in a basic way. It is not as if the trial judge would not have known what medical and personal episodes had not been revealed to appellant. In Count I of the counterclaims, the appellant recites in graphic detail the disclosures that appellee failed to make concerning N.L. The counterclaims were a matter of public record, despite the exclusion of the further details that the appellant sought to introduce into evidence at trial. While allegations in a counterclaim are not evidence, as such, the trial judge could not have been under any illusions about why appellant was complaining of the non-disclosures and how they related to co-parenting. If anything, Judge Davis (and later Judge Vincent) simply ruled that it was not necessary or relevant to repeat and expand upon those counterclaim details at trial. Moreover, some of the evidence that was excluded appeared to be an effort to smear the appellee personally with regard to her social life. We readily infer that this was part of the concern of both judges. The two judges acted within their discretion to exclude this kind of evidence.

We are not persuaded that appellant was prejudiced by his inability to offer evidence of appellee's alleged non-disclosures, and appellant has failed to demonstrate that the trial court abused its discretion in making and adhering to the pretrial discovery ruling.

*Counterclaim II (Appellee's Breach of the Implied Covenant of Good Faith and Fair Dealing).* This counterclaim is essentially a different way of expressing what is contained in the first. Herein, appellant demanded a declaratory judgment that he was not obligated to reimburse appellee for any of the ASR costs. This counterclaim had no merit and was properly denied.

*Counterclaim III (Appellee's Breach of Section 12.2 of the Agreement).* Here again, appellant complains of the money judgment requiring him to pay for N.L.'s attendance at ASR. Since we affirm the part of the judgment regarding the ASR expenses, we have no basis for criticizing the rejection of this counterclaim.

 *The Defense of Laches.* "For a successful defense of laches, the trial court must find 'an undue and unexplained delay on the part of one party which works an injustice to the other party.'" *Curtis v. Gordon,* 980 A.2d 1238, 1246–47 (D.C.2009) (quoting *Amidon v. Amidon,* 280 A.2d 82, 84 (D.C.1971) (internal citations omitted)). In the instant case, appellant contends that he was prejudiced by appellee's 19–month delay in commencing litigation, including 13 months during which appellee failed to demand payment of the ASR costs. In his brief, he elaborates that appellee paid the expenses of N.L.'s attendance at ASR for 13 months, while continuing to exchange written and verbal communications with appellant without any demand for payment. The first demand for payment came from appellee's lawyer on August 10, 2001. The record shows that appellant

responded through his lawyer. His attorney indicated that, if sued, appellant would defend against the claim and pursue counterclaims and legal fees. Appellee did not file her breach of contract complaint until February 15, 2002.

The trial court concluded that appellant had failed to establish the elements of this defense. The judge pinned her conclusion on a factual finding with regard to appellee's testimony. The judge wrote:

> The plaintiff credibly explained her delay in commencing this litigation. The plaintiff believed the defendant when he told her he would utilize his knowledge as a lawyer to make any litigation unduly burdensome. Moreover, the plaintiff explained that the degree of disharmony between the parties was such that she felt overwhelmed by the prospect of even attempting to negotiate or discuss issues related to the children with the defendant. Thus, the plaintiff attempted to informally resolve the issues, short of commencing litigation. When her efforts proved fruitless, the plaintiff resigned herself to the conclusion that litigation was the only resource left to gain the defendant's compliance with the agreement.

Memorandum and Order at 16.

■■■ "The determination on applicability of a laches defense is a mixed question of law and fact. We will review the trial court's factual determinations for clear error, and we will review whether those facts are sufficient to sustain the defense *de novo.*" *Curtis v. Gordon, supra,* at 1246 (footnote and citation omitted).

We sustain the trial court's denial of the laches defense for several reasons. First, we address appellant's attack on the factual findings. Appellant denied at trial that he had made the intimidating statements attributed to him. He contends that the trial court should have believed him because, in his view, he had no reason to make any aggressive statements to the appellee on this subject prior to August 10, 2001. The demand letter from her lawyer was appellant's first indication that appellee thought he had breached the Agreement. He also points out in his brief that the claim of being too "overwhelmed" to discuss issues regarding the children is inconsistent with the fact that the parties did have such discussions during the 13–month, pre-demand period.

We are not persuaded that the trial court's factual findings and credibility assessment were "clear error." One, the trial judge made her own judgment of the relative believability of the parties as to whether and when the appellant made the critical statements to appellee. The trial court simply did not believe the appellant. Two, the trial judge credited the appellee's testimony that she attempted to resolve the payment issue short of litigation, and using an attorney as a go-between to make a demand for payment is entirely consistent with not lightly plunging into a lawsuit. It was evident that appellee hoped the attorney could obtain payment for her, and this simply failed.

Furthermore, the appellant has not explained on appeal how the delay in filing suit prevented him from mounting a defense or asserting any missing counterclaim. There is no claim that evidence was lost due to delay or that any other palpable prejudice arose. At best, appellant complains that if appellee had revealed her claim against him prior to the lawyer's demand letter, appellant would have challenged her interpretation of the Agreement before the ASR costs had accumulated to more than $65,000.00. He implies that filing suit on his own at an earlier point in time would have saved him a large sum of money. However, this is purely speculative, as he might not have

prevailed. Moreover, as the history of this case demonstrates, no one could have guaranteed that his lawsuit would have concluded before N.L. ceased attending ASR. His unique claim of "injustice" falls flat.

Under the totality of circumstances, as reflected in the record, we conclude that the trial judge correctly found the evidence insufficient to sustain this defense.

For all of these reasons, the trial court's adverse rulings rejecting the defense of laches and denying appellant's counterclaims will be *affirmed.*

### D. Legal Fees

Section 17.1 of the Agreement articulates a right to indemnification of legal expenses, in the event of litigation involving breach of contract. It states,

> If either party fails in the due performance of any of his or her obligations hereunder, the aggrieved party shall have the right to seek enforcement of this Agreement, to sue for damages for the breach thereof, or to seek such other legal remedies as may be available to him or her. The party found in breach of the Agreement shall pay all legal fees and costs related to the other party's asserting his or her rights.

 The trial court ordered appellant to pay all of appellee's legal fees and costs. Our reversal of the money judgment payable to Z.H. obviously means that appellee was not entitled to any relief on one of the two major claims underlying the judgment. We read the Agreement to say that a fee award must be linked to a breach of contract claim that was successful, not fees billed to litigate a claim that collapsed on

appeal. In other words, the determination of fees must have a genuine nexus to the proven breach of contract. In light of our disposition of this appeal, appellee was not entitled to indemnification for legal fees and costs incurred by appellee to pursue the UGMA issue.[11] Accordingly, fairness requires the trial court to revisit the determination of the original fee award. While we will not dictate how the trial court should parse the services of appellee's counsel, we at least conclude that the appellee was not entitled to indemnification for 100% of what her lawyers billed.

*Reversed in part, affirmed in part, and remanded.*

---

11. The Agreement does not employ the broad language of "prevailing party" as the definition of which litigant would be entitled to a fee award. On remand, in the absence of a settlement, the trial court may solicit briefing and/or conduct a hearing on the enforcement of the indemnity clause.