*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CT-335

ANDRE HOLMON, APPELLANT,

v.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior
Court of the District of Columbia
(CCC-12-15)

(Hon. Marisa J. Demeo, Trial Judge)

(Argued November 1, 2016                    Decided February 28, 2019)

*Dennis M. Hart* for appellant.

*John W. Donovan*, Special Assistant Attorney General, Office of the Solicitor General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General at the time the brief was filed, and *Rosalyn C. Groce*, Deputy Solicitor General, were on the brief, for appellee.

Before EASTERLY and MCLEESE, *Associate Judges*, and RUIZ, *Senior Judge*.

RUIZ, *Senior Judge*: This appeal requires us to consider the application of evidentiary principles of hearsay to the admissibility of evidence obtained from a cellphone and the use of such evidence as proof of criminal contempt for violating a civil protection order ("CPO") that prohibited appellant from having contact with a specific person. We conclude that the trial court properly admitted evidence from that person's cellphone regarding appellant's calls, and that there was

sufficient evidence to sustain the trial court's finding that appellant's conduct of calling the specified person's cellphone constituted contact and violated the terms of the CPO.  We affirm the judgment of the trial court.

## I.  The Trial

On March 24, 2015, Associate Judge Marisa Demeo presided over appellant's bench trial.  The trial judge took judicial notice of a CPO, entered on June 20, 2014, which provided that appellant "shall stay at least 100 feet away from" Ms. Erie Hollonquest, her home, her workplace, her vehicle, and her father's nursing home.  The CPO also stated that appellant "shall not contact [Ms. Hollonquest] in any manner, including but not limited to" by telephone, in writing, or "[i]n any other manner, either directly or indirectly through a third party."  The government presented three witnesses at trial:  Ms. Hollonquest and Officers Richard Davis and Michael Daly of the Metropolitan Police Department ("MPD").  Appellant testified in his defense.

Ms. Hollonquest testified that she had known appellant for three years and once lived with him.  On November 15, 2014, while the CPO was in effect, Ms. Hollonquest checked her mail on the ground floor of her apartment building.  As she sat down on the bottom steps leading to the ground level, Ms. Hollonquest saw

appellant run into the building. Ms. Hollonquest testified that appellant then ran toward her and said "I'm going to crush you." After two people stepped in between appellant and Ms. Hollonquest, she called 911.[1]

Ms. Hollonquest testified that appellant had called her cellphone "several times" that day before the encounter in the building lobby. She did not answer those calls, but knew it was appellant calling because "his name was in [her] phone under his number," and "[h]is name appeared" as the caller on her cellphone's screen. She always used this number "in [her] phone" to call appellant, and appellant always called her from that number. Ms. Hollonquest could not remember appellant's phone number offhand, but believed that the last four digits were either "1491" or "4191." Ms. Hollonquest testified that she showed the missed calls displayed on her phone to an MPD officer who responded to her 911 call.[2]

Officer Davis responded to the 911 call and interviewed Ms. Hollonquest at her apartment building. He testified that during this interview, she showed him the

---

[1] Ms. Hollonquest testified that she was "distraught" and "scared" when calling 911 because she felt like appellant was "in a rage."

[2] Ms. Hollonquest's phone was stolen at some point prior to trial and could not be introduced into evidence.

"missed calls" screen on her cellphone, which listed "a missed call with a cell phone written on it." Specifically, he saw the phone number and wrote it down in his notes. At trial, Officer Davis could not recall how many missed calls were listed, or the telephone numbers for the missed calls, but his contemporaneous notes recording the phone number (XXX) XXX-1491 were admitted into evidence. Defense counsel objected, based on hearsay, to admission of the telephone number Officer Davis recorded from the cellphone's "missed calls" screen. The trial judge concluded that the "missed calls" screen evidence was not hearsay because the screen was not a "person making an out-of-court statement."

Officer Daly testified about his interactions with appellant when he went to the apartment building after the 911 call. Officer Daly sat with appellant and also took notes, which he consulted at trial. Looking at the notes, Officer Daly testified that he recorded appellant's phone number as (XXX) XXX-1491—the same number Officer Davis had seen on Ms. Hollonquest's phone.

Appellant testified to a different version of events. He stated that Ms. Hollonquest called him on November 15, 2014, asking for sixty dollars. Appellant admitted that both he and Ms. Hollonquest knew appellant had a stay-away order, but maintained that she promised not to call the police. Once he arrived to give her the money, appellant saw Ms. Hollonquest asking two men in

the hallway whether she could "buy some weed or something." When appellant questioned her about how she planned to use the money she requested, she became "upset" and "[v]ery hostile," and retaliated by calling the police. Appellant left the building when Ms. Hollonquest called 911, but then spoke with the officers outside of the building once they arrived on the scene.

The trial court found that appellant violated the CPO "voluntarily and on purpose, and not by mistake or accident," in two respects: (1) by coming within 100 feet of Ms. Hollonquest and her home, and (2) by contacting Ms. Hollonquest via telephone.[3] He was sentenced to 180 days on each count, with the sentence suspended. Appellant filed a timely appeal challenging only the conviction on the second count, based on the telephone calls.

---

[3] The trial court relied on three pieces of evidence: First, appellant's testimony that he answered Ms. Hollonquest's phone call and "continued the conversation" could have "transferred the initial call by [Ms. Hollonquest] into a violation [by appellant] when he didn't hang up." Second, Ms. Hollonquest's testimony that appellant called her on November 15, 2014, using the same phone number that he had always used to call her, the last four digits of which she knew to be 1491, and the testimony of Officers Davis and Daly that they saw that number on the "missed calls" screen and heard appellant provide this same telephone number as his own. Finally, appellant's admission that he went to Ms. Hollonquest's apartment building later in the day, which strengthened the inference that he called Ms. Hollonquest in violation of the CPO because "[i]t actually suggests that he was trying to reach her before coming over."

## II. Evidence of Missed Calls

### A. Hearsay

Appellant challenges the trial court's admission of Officer Davis's evidence of the missed calls over his hearsay objection.[4] We review the factual findings underlying the trial court's evidentiary ruling for clear error and "the decision whether to admit or exclude the proffered statement, based on those factual findings" for abuse of discretion, *Odemns v. United States*, 901 A.2d 770, 776 (D.C. 2006), "recognizing that it is necessarily such an abuse for the trial court to employ 'incorrect legal standards,'" *In re C.A.*, 186 A.3d 118, 121 (D.C. 2018) (quoting *Mayhand v. United States*, 127 A.3d 1198, 1205 (D.C. 2015)).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted." *Little v. United States*, 613 A.2d 880, 882 (D.C. 1992) (quoting Fed. R. Evid. 801 (c)). A "statement," for hearsay purposes, is "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." *Id.*

---

[4] Appellant did not make a hearsay objection to the admission of Ms. Hollonquest's testimony that she knew appellant had called her cellphone because his name (which she apparently had saved in conjunction with a phone number) appeared on the screen when she received the call.

(quoting Fed. R. Evid. 801 (a)).[5] "The primary rationale for excluding hearsay is the lack of an opportunity to cross-examine the out-of-court declarant whose statements are admitted for the truth of the matter contained in them." *Steadman v. United States*, 358 A.2d 329, 331 (D.C. 1976)

Hearsay statements traditionally have been made, and usually are made, directly by a person making an assertion out of court. But an assertion that is "implied" or "conveyed only in substance" may nevertheless constitute a hearsay statement. *Young*, 63 A.3d at 1044. Technological innovations, in particular, have led courts to conclude that a machine-generated statement may imply hearsay if the statement "depend[s] on" human inputs that "require judgment or permit subjectivity." *Id.* at 1046; *see also* 2 MCCORMICK ON EVIDENCE § 249 (Kenneth S. Broun et al. eds., 7th ed. 2016) ("[C]areful analysis is required regarding the nature of human involvement and extent of human judgment reflected in the results in determining whether the machine response should be treated as nonhearsay.").

This is the conclusion we reached with respect to testimony that relied on a computer-generated calculation of DNA match probability that, in turn, depended

---

[5] The Federal Rules of Evidence currently define a statement, for hearsay purposes, as a "person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801 (a); *Garibay v. United States*, 72 A.3d 133, 137 n.6 (D.C. 2013).

on human intervention. In *Young*, the FBI collected a semen sample from a vaginal swab of a sexual assault victim, and a second sample from a paper tissue found at the crime scene. 63 A.3d at 1036. For each sample, FBI laboratory technicians reportedly produced a DNA profile of the source of the semen. *Id.* Years later, the FBI obtained a buccal swab of Mr. Young and generated a corresponding DNA profile. *Id.* At the direction of FBI examiner Craig, who testified at trial, a subordinate FBI employee entered data from Mr. Young's DNA profile into an FBI computer program that contained the DNA data derived from the sexual assault evidence. *Id.* at 1038. After running the program, the subordinate provided examiner Craig with a printout showing the calculation of the random match probability ("RMP") between the DNA profile derived from the buccal swab and the DNA profiles derived from the vaginal swab and paper tissue. *Id.* Based on the RMP, examiner Craig concluded, to a reasonable degree of scientific certainty, that Mr. Young committed the sexual assault. *Id.* At Mr. Young's trial, and over his Confrontation Clause objection,[6] examiner Craig testified as an expert witness regarding the methodology she used to compare the DNA profile derived from the buccal swab with the "DNA profiles derived from [the victim's] vaginal swabs and [the] tissue." *Id.* at 1037, 1045.

---

[6] A Confrontation Clause objection raises two questions: "(1) whether [the challenged evidence] transmitted hearsay and, (2) if so, whether that hearsay was testimonial." *Young*, 63 A.3d at 1044. Only the first question concerns us here.

This court held that examiner Craig's testimony contained hearsay because it impliedly relayed, for their truth, at least two out-of-court assertions from other FBI lab technicians: (1) that the two semen samples from which the DNA profiles were generated came from the victim's vagina and the paper tissue, and (2) that the absent FBI lab technicians "employ[ed] certain procedures" to generate the DNA profiles from these samples. *Id.* at 1045. These assertions were necessarily implied, the court reasoned, because "[w]ithout them, what would have been left of Craig's testimony—that she matched two DNA profiles she could not herself identify—would have been meaningless." *Id.*

Applying the analysis employed in *Young*, we come to the opposite conclusion, and hold that the statement in Officer Davis's notes did not contain hearsay. In this case, there were several layers of hearsay. As noted, Officer Davis could not recall the number he saw on the "missed calls" screen from memory, and relied on his contemporaneous notes. Officer Davis's notes as to the number he saw on Ms. Hollonquest's cellphone were hearsay, but were admitted under the exception for past recollection recorded. The hearsay issue presented in this appeal is not whether the notes themselves were hearsay, but whether the notes implied the further statement that (XXX) XXX-1491 originated the calls to Ms. Hollonquest's cellphone and, if so, whether that statement "depend[s] on [human] inputs that require judgment or permit subjectivity," or is "nothing more than raw

data produced by a machine." *Id.* at 1046 (citations omitted). We have no difficulty concluding that the statement in Officer Davis's notes that the number (XXX) XXX-1491 was displayed on the missed calls screen relayed the implicit assertion that the phone associated with that number originated the calls to Ms. Hollonquest's cellphone. However, we conclude that because that assertion was purely machine-generated and had no "author" who could have been cross-examined in court, it was not hearsay.

Appellant conceded at trial that the telephone number that appeared on the missed calls screen was not "manually typed" into Ms. Hollonquest's cellphone by a person.[7] This is so because "[t]he invention of electronic switching systems in telecommunications has eliminated the need for manual involvement" in recording phone traffic. *People v. Holowko*, 486 N.E.2d 877, 879 (Ill. 1985) (quoting *State v. Armstead*, 432 So.2d 837, 839 (La. 1983)). "Since the computer is actually responsible for making the telephone connection, the computer can be programmed to record the source of any incoming call." *Id.* And because this recording does

---

[7] Although appellant notes that Ms. Hollonquest appears to have entered appellant's name into her cellphone with that number, *i.e.*, as a "contact," as explained above, appellant did not object to admission of Ms. Hollonquest's testimony that she saw his name appear when he called her phone. At trial as on appeal, appellant challenged as hearsay only Officer Davis's testimony that the missed call screen displayed a telephone number, and he did not call the trial court's attention to the discrepancy between the testimony of the two witnesses.

not depend on human input, several jurisdictions have held that a witness's testimony regarding a caller identification system's display of a phone number is not hearsay. *See, e.g.*, *Tatum v. Commonwealth*, 440 S.E.2d 133, 135-36 (Va. Ct. App. 1994); *Culbreath v. State*, 667 So. 2d 156, 162 (Ala. Crim. App. 1995), *abrogated on other grounds by Hayes v. State*, 717 So. 2d 30, 33 (Ala. Crim. App. 1997).[8] We are aware of no jurisdiction holding otherwise.

Appellant argues that information appearing on a telephone's missed calls display nonetheless constitutes hearsay because "somebody"—*i.e.*, the phone system designer and manufacturer—"had to program the phone for it to do that." However, the fact that a human being was involved at some point in developing the automated system does not resolve the hearsay issue before us. "[T]here can be no statements which are wholly machine-generated in the strictest sense; all machines were designed and built by humans." *United States v. Lamons*, 532 F.3d 1251, 1263 n.23 (11th Cir. 2008). Because "human agency is at some level necessarily

---

[8] Some jurisdictions have gone further and held, in the context of automated caller identification systems, that the system's display of a caller's name—not simply the originating number—does not constitute hearsay. *See, e.g.*, *Bowe v. State*, 785 So. 2d 531, 532 (Fla. Dist. Ct. App. 2001); *Inglett v. State*, 521 S.E.2d 241, 245 (Ga. Ct. App. 1999). We decline to endorse or reject this conclusion here because the question is not before us, *see supra* note 4, and because the display of a caller's identity on a cellphone might sometimes depend on human inputs (*e.g.*, the entry of a "contact") rather than solely "computer-generated data." *Inglett*, 521 S.E.2d at 245.

involved" in producing any machine-generated statement, the inquiry turns on "the nature of human involvement and extent of human judgment reflected in the results in determining whether the machine response should be treated as nonhearsay." MCCORMICK ON EVIDENCE, *supra*, § 249.[9]

The testimony in *Young* was deemed hearsay because it relayed the assurances of other lab technicians that they had generated the crime scene DNA profiles using proper procedures and from the relevant samples in that "particular case." *Id.* at 1045. It was critical to the factfinder's assessment of examiner Craig's testimony that there was a DNA match with the defendant's DNA to know about the inputs and judgments these absent lab technicians made because correct inputs have a direct relationship to the correctness of outputs, or, as the court colloquially quoted, "garbage in, garbage out." *Id.* at 1046 n.49. Here, by contrast, there was no technician who input information that resulted in the number displayed on Ms. Hollonquest's cellphone and whose examination would have been useful to assess the accuracy of the statement recorded in Officer Davis's

---

[9] The government asks us to liken "the data-driven programs that generated the missed-call entries on Ms. Hollonquest's phone" to "tool[s] to aid perception, much like binoculars, a telescope, or glasses," which are not capable of producing hearsay statements. *See Holmes v. United States*, 92 A.3d 328, 331 (D.C. 2014). We think that analogy is inapt. The programs that identify missed calls on cellphones go beyond simply aiding human perception and generate information that would not otherwise be available to a person by using the senses.

notes. Although "somebody" programmed the phone to recognize an incoming number that was transmitted by a switching system built by another somebody—many somebodies most likely—the developers of the underlying systems had no direct involvement in the specific assertion at issue in this case: that (XXX) XXX-1491 originated the calls to Ms. Hollonquest's phone. Thus, even if they could have been identified and brought to court, their testimony would have been unhelpful to assess the specific implied assertion in Officer Davis's notes that the calls originated from appellant's phone.[10] Therefore, we conclude that the trial judge did not abuse her discretion in overruling appellant's hearsay objection to the evidence that the number (XXX) XXX-1491 called Ms. Hollonquest as displayed on the "missed calls" screen of her cellphone.

## B. Unreliability

That the missed call information on the cellphone screen is not properly characterized as hearsay does not mean that its admissibility is immune from any challenge. Appellant also questions the admissibly of data from a mobile phone's call identification system on grounds of unreliability, emphasizing that we cannot be certain of the source of the telephone calls. Defense counsel did not specifically

---

[10] However, their testimony could be relevant to a well-founded challenge to the reliability of the underlying systems, *see* the next section.

object to the reliability of the missed calls display or telephone number identification systems at trial; instead, while explaining the grounds for appellant's hearsay objection, defense counsel referred to the possibility that the service provider or some person could have generated erroneous "missed calls" information on Ms. Hollonquest's cellphone.[11] We do not read counsel's objection as a separate challenge to the reliability of the underlying system because it was embedded in the hearsay objection on which the court and counsel focused. Counsel's questioning of the system's reliability, such as it was, lacked sufficient specificity to alert the trial judge that appellant intended to raise a separate ground for excluding the evidence. *See Hunter v. United States*, 606 A.2d 139, 144 (D.C. 1992) (noting that, to be sufficient, an objection must be "reasonabl[y] specific[]; the judge must be fairly apprised as to the question on which he is being asked to rule"). As a result, counsel did not argue its merits and the trial court did not rule on it. Therefore, we apply plain error review.

Plain error consists of four components: (1) an "error"; (2) that is "plain"; (3) "affects [appellant's] substantial rights"; and (4) "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Olano v. United States*, 507

---

[11] Defense counsel argued that "it could be from multiple sources. Either from the phone company whose [sic] sending caller ID information to the phone or it could have been the individual who just wrote this on the phone itself."

U.S. 725, 732 (1993) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)) (alterations and internal quotations omitted).

The element of plain error review that weighs most heavily against appellant is that an error, if any, must be "plain," meaning "clear" or "obvious." *Id.* at 734. Here, appellant's counsel referred to possible unreliability only in passing, and provided no fleshed-out argument or evidence to substantiate an objection to the reliability of the cellphone's missed calls display or the service provider's call identification system. To the contrary, evidence at trial supported that the call identification system was reliable as Ms. Hollonquest testified that appellant's name and number were in her phone, that appellant always called her using this number, and that this was the only number she used to call appellant. Officer Daly testified that appellant identified the number as his. Thus, error, if any, is not clear on our review of the record. Therefore, admission of evidence of the missed calls to establish that appellant had called Ms. Hollonquest was not plain error.

### III. Sufficiency of the Evidence

### A. Standard of Review

An appeal challenging whether conduct constituted a violation of a CPO presents a "question of law, and we review the trial court's resolution of that

question *de novo*." *In re Ferguson*, 54 A.3d 1150, 1152 (D.C. 2012) (quoting *Ba v. United States*, 809 A.2d 1178, 1182-83 (D.C. 2002)). In reviewing the sufficiency of evidence in a bench trial, "this court will not reverse unless an appellant has established that the trial court's factual findings are 'plainly wrong,' or 'without evidence to support them.'" *Jones v. United States*, 67 A.3d 547, 549 (D.C. 2013) (quoting *Mihas v. United States*, 618 A.2d 197, 200 (D.C. 1992)) (alteration omitted). The appellant bears the burden of showing that "the government presented 'no evidence' upon which a reasonable mind could find guilt beyond a reasonable doubt." *Mihas*, 618 A.2d at 200 (quoting *Robinson v. United States*, 506 A.2d 572, 573 (D.C. 1986)).

While this standard is "deferential," it is not meant to be a "rubber stamp" of the conviction. *Swinton v. United States*, 902 A.2d 772, 776 n.6 (D.C. 2006). "Slight evidence is not sufficient evidence; a 'mere modicum' cannot 'rationally support a conviction beyond a reasonable doubt.'" *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 320 (1979)). "The evidence must support an inference, rather than mere speculation, as to each element of an offense." *Lewis v. United States*, 767 A.2d 219, 222 (D.C. 2001) (quoting *Head v. United States*, 451 A.2d 615, 622 (D.C. 1982)).

## B. Analysis

"To establish the elements of a CPO violation, the government must present evidence proving beyond a reasonable doubt that defendant engaged in: (1) willful disobedience (2) of a protective court order." *Ba*, 809 A.2d at 1183. "[C]onsent of the petitioner [of a CPO] does not bar a conviction of criminal contempt for [the] violation of a CPO." *In re Shirley*, 28 A.3d 506, 513 (D.C. 2011). However, we have suggested that a respondent might not "willfully" violate a CPO where the "petitioner approached the respondent without his encouragement or consent," where the "contact was necessitated by an emergency," or where there exists some other compelling reason. *Id.* at 512. But even then, we have indicated that "the respondent presumably would have an obligation to terminate the contact, if that is possible." *Id.* at 512 n.7.

Appellant does not contest the validity of the CPO or his knowledge of it. Instead, appellant questions whether the evidence of his conduct presented at trial amounted to a willful violation of the CPO, arguing that: (1) appellant was charged with calling Ms. Hollonquest between 1:00 and 1:30 p.m. on November 15, 2014, but no evidence at trial established the times at which the missed calls were made; (2) the government did not definitively establish that appellant made

those calls because some other person could have used his phone, or that he did so voluntarily, citing "pocket dials" to contacts saved on one's phone as a common source of accidental or involuntary calls; and (3) a call that is made, but does not actually connect with the person called, does not constitute actual "contact" via telephone in violation of the CPO.

We begin by noting that the missed calls were not the only evidence supporting a violation of the CPO's prohibition on phone calls with Ms. Hollonquest. Appellant testified that he answered a call from Ms. Hollonquest during which Ms. Hollonquest asked him for money. He agreed to do so, even as he said he was not supposed to be "around" her. Appellant's willingness to engage in this non-emergency conversation is some evidence of his contempt for the CPO even if he did not initiate the contact. *See In re Shirley*, 28 A.3d at 512 n.7.

Turning to appellant's challenge to the sufficiency of the missed calls evidence, the exact times of the missed calls are irrelevant to appellant's conviction as the CPO does not specify times where calling is prohibited, but rather prohibits all contact via telephone.[12] Ms. Hollonquest testified that the missed calls appeared on her cellphone's screen on November 15, 2014, when the CPO was in

---

[12] Appellant does not contend that he lacked notice or was in any way prejudiced by the times specified in the information in this misdemeanor case.

effect. Appellant's argument that the cellphone's missed calls display fails to prove conclusively that he was the source of those calls or that he made them voluntarily ignores the trial judge's reliance on other evidence to infer that appellant intentionally made those calls. The trial judge noted that appellant's showing up at Ms. Hollonquest's apartment building later that day "actually suggests that he was trying to reach her [via telephone] before coming over." While it is *possible* that appellant's phone "pocket dialed" Ms. Hollonquest, the trial court was not required to infer that is what happened over the more likely scenario that fits in with his other actions that day. *See Jones v. United States*, 716 A.2d 160, 162 (D.C. 1998) (explaining that "[t]he government need not disprove every theory of innocence" for sufficient evidence to support a conviction).

The missed calls from appellant's number that appeared on Ms. Hollonquest's cellphone support the conclusion that appellant "contacted" her in violation of the CPO. We have not yet interpreted the meaning of "contact," for purposes of a CPO, in the context of telephone calls that are made, but where no actual conversation ensues. But the plain language definition of "contact" suggests that intentional actions that result in missed calls constitute contact. *See State v. McGee*, 84 P.3d 690, 693 (N.M. Ct. App. 2003) (citing WEBSTER'S THIRD NEW

INTERNATIONAL DICTIONARY (2002)).[13] In *McGee*, the court decided that a call, even if unanswered, violated the "no contact" provision of a protection order because such an order was not limited to "direct communication." 84 P.3d at 692-93. A CPO is designed to, among other things, protect a petitioner from emotional violence, *see Richardson v. Easterling*, 878 A.2d 1212, 1217 n.6 (D.C. 2005), and provide the petitioner "a measure of peace of mind," *Maldonado v. Maldonado*, 631 A.2d 40, 43 (D.C. 1993). These purposes support interpreting "no contact" to prohibit calls even if the recipient does not answer.

Other forms of prohibited contact in a CPO, such as writing or "any other" method of contact, do not require the CPO petitioner to be aware of either the attempted contact or its message. For example, in *In re Sobin*, 934 A.2d 372, 373 (D.C. 2007), a CPO prohibited Mr. Sobin from "contact[ing] [his son] . . . in any manner, either directly or indirectly through a third party." Mr. Sobin asked an attorney, who was representing his son in an unrelated matter, to relay a message to his son. *Id.* This court held that the CPO's no contact provision put Mr. Sobin

---

[13] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 490 (2002) defines "contact" as "an instance of establishing communication with someone . . . or of observing or receiving a significant signal from a person or object." Appellant's competing definition of "contact" as "(1) the act or state of touching or meeting, (2) the state or fact of being in touch, communication, or association" as a noun, and "(1) to place in contact, (2) to come into contact with and (3) to get in touch or communicate with" as a verb, is not inconsistent with this understanding.

"on notice" that he could not "attempt to contact his son" or "initiate contact with [his son]" through the attorney. *Id.* at 374. Accordingly, this court affirmed Mr. Sobin's conviction of criminal contempt for violating the CPO because his request to the attorney to communicate a message sufficed to violate the CPO's no contact provision. *Id.* at 374-75. This court's decision did not depend on or discuss whether Mr. Sobin's son actually received Mr. Sobin's message. *Id.* Although the aim of a CPO is to protect the petitioner, a CPO is focused on controlling the conduct of the person to whom the CPO is directed, and its terms should be interpreted in that light.

Appellant recognizes that if Ms. Hollonquest "declined to answer after viewing the incoming call screen, an argument could be made for a completed contact." Appellant maintains, however, that there is no evidence that supports such a theory in this case. We disagree. Ms. Hollonquest testified that when appellant called her on November 15, 2014, she chose not to answer because she knew the call was from appellant. Therefore, her testimony qualifies the "missed" phone calls as a "completed contact" under the theory acknowledged in appellant's brief.[14] Taken in the light most favorable to sustaining the trial court's findings of

---

[14] Ms. Hollonquest's actions are also similar to those of the petitioner in *In re Dixon*, 853 A.2d 708, 710 (D.C. 2004), where the petitioner hung up as soon as she realized appellant was calling her in violation of the no contact provision of a

(continued . . .)

guilt, we conclude that the evidence is sufficient to establish a violation of the CPO based on appellant's unanswered telephone calls to Ms. Hollonquest.

For the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

_____
(. . . continued)
CPO.  While the appellant in *Dixon* was convicted of only one count of criminal contempt, each of the eighteen phone calls placed to the petitioner, including those where she hung up immediately after identifying the caller, amounted to a violation of the CPO.  *Id.* at 711.