*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 19-CV-541 & 19-CV-906

ROBIN MINGLE, APPELLANT,

v.

OAK STREET APARTMENTS LTD. C/O CIH PROPERTIES, INC., APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(LTB-7633-17)

(Hon. Lee F. Satterfield, Trial Judge)

(Argued January 26, 2020     Decided April 29, 2021)

*Joseph V. Coniglio* for appellant.

*Timothy P. Cole*, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, THOMPSON, *Associate Judge*, and FERREN, *Senior Judge*.

Opinion for the court by *Senior Judge* FERREN.

Concurring opinion by *Senior Judge* FERREN, at page 15.

FERREN, *Senior Judge*: Robin Mingle appeals an order of the trial court granting her landlord, Oak Street Apartment C/O CIH Properties, Inc. ("Oak Street"), a writ of restitution and non-redeemable judgment for possession of her

apartment. The court based its order on a finding that Mingle had violated paragraph 3 of the parties' May 14, 2018, settlement agreement (the "Agreement") that required her to remove all "unauthorized occupants" from the premises. We stayed execution of the writ pending appeal. Mingle offers two arguments that lead to a dispositive ruling: *first*, that the trial court erred in ruling that the Agreement not only required her to remove all unauthorized occupants by the date specified, May 21, 2018, but also imposed a continuing obligation to do so until the Agreement ended on November 14, 2019; and *second*, that even if the trial court correctly construed paragraph 3 of the Agreement to impose a continuing obligation, the evidence presented was insufficient to support a ruling that she had violated that paragraph. We agree with Mingle's second contention. The evidence of a paragraph 3 violation was insufficient to support the trial court's ruling. We therefore vacate the stay and reverse.

## I. Factual Background and Procedural History

On May 2, 2019, Oak Street filed a suit for possession of the premises, alleging that Mingle had violated paragraph 3 of the parties' Agreement. That paragraph required Mingle to "remove all unauthorized occupants within seven days of filing this Settlement Agreement." It adds that Mingle "understands that

an unauthorized occupant is any person who is residing in the premises for 14 consecutive days." Paragraph 5 of the Agreement provides that, if Mingle should violate "any" of paragraphs "1 through 3" of the Agreement "within eighteen months" of its filing, Oak Street would be "entitled to file a motion for a non-redeemable judgment for possession" of Mingle's apartment.

In its motion for a non-redeemable judgment of possession, Oak Street alleged that Mingle had breached paragraph 3 of the Agreement by permitting an unauthorized occupant named "Rickey Bob" [Canty][1] to reside in her apartment. On May 17, 2019, the trial court held an evidentiary hearing. Both parties called Mingle to testify, and Oak Street relied as well on the testimony of Jesus Villa, an assistant community manager at Oak Street who lived on Mingle's floor. Both parties also submitted documentation to support their arguments. At the conclusion of the hearing, the trial court issued an oral order granting Oak Street's motion based on a finding of fact that Oak Street had "established by a preponderance of the evidence" that Mingle had "an unauthorized person in [the] premises," and thus a conclusion of law that Mingle was "in violation of [the] agreement."

---

[1] Mr. Canty is variously called "Rickey Bob," "Ricky Bob," "Ricky Canty," and "Canty" in the court documents. As there will be no confusion, we use the spelling found in a particular document or the most common use, "Ricky Canty."

On June 6, 2019, the court entered a writ of restitution which, if executed, would have resulted in Mingle's eviction on or about July 19, 2019. Mingle filed a notice of appeal on June 14, 2019, and on June 26, 2019, filed a motion in the trial court for a stay of execution of the writ pending appeal. After the trial court failed to enter a timely ruling on her motion, Mingle filed an emergency motion with this court on July 2, 2019, to stay execution of the writ pending our review. On July 16, 2019, this court "administratively stayed" execution of the writ of restitution to permit the trial court to issue an order that would "expeditiously" resolve the stay motion, including written findings of fact and conclusions of law. The court also directed Mingle to file a statement with this court, "within three calendar days" of the trial court's order, "explaining the impact of the order" on the pending motion to stay.

Pursuant to this court's July 16, 2019, order, the trial court held a hearing a month later on August 15, on Mingle's motion to stay. On August 29, 2019, the court denied her motion based on written findings of fact and conclusions of law. In doing so, the court addressed witness credibility but did not revisit the details of occupancy, preferring (albeit cryptically) to incorporate its oral findings of May

17, 2019.[2]  Also pursuant to this court's July 16, 2019, order, Mingle filed with this court a statement explaining the impact of the trial court's order denying her stay motion.

On September 19, 2019, we granted Mingle's motion to stay execution of the writ of restitution and, on the following day, we referred the case to mediation. On September 27, 2019, Mingle filed a second notice of appeal, this one asking for review of the trial court's August 29, 2019, denial order stating its written findings of fact and conclusions of law.  On October 17, 2019, we consolidated the two appeals.

## II.  Standard of Review

Questions of fact are reviewed under a "clearly erroneous" standard.[3]  "An issue is designated a question of fact if it involves the who, what, where, when and

---

[2] "Given the evidence presented in this case *as articulated earlier* and the entire record, Defendant is not likely to succeed on the merits." (emphasis added).

[3] Super. Ct. Civ. R. 52(a)(6); *see Davis v. United States*, 564 A.2d 31, 35 (D.C. 1989) (en banc).

how details of the case[.]"[4] "The 'clearly erroneous' standard precludes the appellate court from setting aside a trial court's finding of fact unless the 'judgment is plainly wrong or without evidence to support it.'"[5] Where facts are reasonably susceptible to more than one interpretation, the appellate court must defer to the trial court's judgment.[6]

While the clearly erroneous standard is deferential, it is not meant to be a "rubber stamp."[7] The evidence upon which the trial court relies must not be so slight or insufficient as to fail to rationally support a finding upon the appropriate standard of proof.[8] Because the standard of proof at issue here is preponderance of

---

[4] *Davis*, 564 A.2d at 35.

[5] *Id.* (quoting D.C. Code § 17-305(a) (1981)).

[6] *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985); *Lee Washington, Inc. v. Washington Motor Truck Transp. Emps. Health & Welfare Trust*, 310 A.2d 604, 606 (D.C.1973).

[7] *Holmon v. District of Columbia*, 202 A.3d 512, 521 (D.C. 2019) (internal citation omitted).

[8] *Cf. id.* at 521 (explaining that, while the "clearly erroneous" standard is deferential, "[s]light evidence is not sufficient evidence; a mere modicum cannot rationally support a conviction beyond a reasonable doubt.") (internal citations and quotations omitted).

the evidence,[9] the question is whether appellee, as the prevailing party, failed to present any evidence upon which a reasonable mind could find a violation of the Agreement by that standard.[10]

### III. Analysis

Appellant Mingle alleges trial court error, arguing: (1) paragraph 3 of the Agreement is unambiguous, simply requiring her to "remove all unauthorized occupants within seven days of filing" the Agreement, with no continuing obligation to remove unauthorized occupants after May 21, 2018, for the duration of the Agreement; (2) even if paragraph 3 were ambiguous, a reasonable person would construe the provision in her favor; (3) the trial court sua sponte raised Mingle's lease as a basis for Oak Street's requested relief, even though Oak Street failed to allege a violation of the lease and the Agreement does not provide for relief based on a lease violation; (4) even if Mingle had a continuing obligation to remove unauthorized occupants for the lifetime of the Agreement, this court's

---

[9] *See In re Tinney*, 518 A.2d 1009, 1013 (D.C. 1986) ("Ordinarily, the party alleging breach of contract in a civil action must prove breach by a preponderance of the evidence.").

[10] *Cf. Robinson v. United States*, 506 A.2d 572, 573 (D.C. 1986) ("Reversal is warranted only where there is no evidence upon which a reasonable mind could infer guilt beyond a reasonable doubt.") (internal citations and quotations omitted).

*Williams* decision[11] shows that the evidence was clearly insufficient for the trial court's finding that Canty was an "unauthorized occupant" for purposes of the parties' Agreement; and (5) the trial court failed to make sufficient findings of fact under Super. Ct. Civ. R. 52(a), including an essential finding that Canty had resided with Mingle for at least fourteen consecutive days and thus was an "unauthorized occupant."

To the contrary, appellee Oak Street argues that the trial court's ruling was correct because: (1) paragraph 3 of the Agreement unambiguously imposed upon Mingle a continuing obligation to remove unauthorized occupants for the lifetime of the Agreement; (2) even if paragraph 3 were ambiguous, a reasonable person would construe the provision in Oak Street's favor; (3) the trial court found it was more likely than not that Canty resided in Mingle's apartment for at least fourteen consecutive days based on an evaluation of the evidence; (4) the trial court's decision to grant Oak Street's request for a writ of restitution and non-redeemable judgment for possession was premised on Mingle's breach of paragraph 3 of the Agreement, not on a lease violation; and (5) the trial court's findings of fact were more than sufficient under Super. Ct. Civ. R. 52(a).

---

[11] *Williams v. District of Columbia Hous. Auth.*, 213 A.3d 1275 (D.C. 2019).

We agree with Mingle that the evidence presented to the trial court was insufficient to support a finding that Ricky Canty (or any other person) was an "unauthorized occupant" under the parties' Agreement. More specifically, for the sake of argument, we shall assume that Oak Street correctly asserts that the Agreement unambiguously required Mingle to remove unauthorized occupants from her apartment for the lifetime of the Agreement, through November 14, 2019. Even so, Mingle's appeal would succeed because the evidence was insufficient to demonstrate (in the trial court's words) that Ricky Canty was "an unauthorized person in the premises" — an erroneous finding that he had resided in her apartment for fourteen consecutive days.[12] Because this evidentiary insufficiency precludes a legal conclusion that Mingle breached paragraph 3 of the Agreement — the only allegation at issue in this matter — we reverse.

In our reaching this conclusion, this court's *Williams* decision[13] is instructive. There, the court concluded that the evidence was insufficient to show that the appellant had violated the "guest stay" policy under the relevant housing regulations by allowing a guest to stay at least the specified number of days

---

[12] No other occupant (if any) during the period of the Agreement is of concern here.

[13] 213 A.3d at 1275.

required to violate the stay policy: either thirty consecutive days, or more than ninety days in a year.[14] We reached this conclusion despite evidence that the appellant's guest had registered and parked two vehicles at the subject property, received mail at the property, regularly visited and stayed overnight there, engaged in activities associated with ownership, such as mowing the lawn, and even informed law enforcement officials that he lived there.[15] We concluded that the hearing officer's ruling that the appellant had violated the "guest stay" policy did not "flow rationally from the factual findings[;] nor [was] it supported by substantial evidence in the record,"[16] because "[n]one of [the hearing officer's] findings addressed in any way — let alone established by a preponderance of the evidence — whether Mr. Campbell had stayed at the Williams home for thirty days consecutively or for ninety days in one calendar year."[17] "To the contrary," we said, "all of this evidence [was] entirely consistent with a situation in which Mr.

---

[14] *See id.* at 1281.

[15] *Id.* at 1280-81.

[16] *Id.* at 1282.

[17] *Id.* at 1281.

Campbell visits Ms. Williams's home frequently, but never violates the guest stay requirements."[18]

We reverse the trial court's ruling here for similar reasons. The court's conclusion that Mingle had violated paragraph 3 of the Agreement was based primarily on the inconclusive testimony of Jesus Villa and on the court's confusing determination that Mingle's testimony that Ricky Canty did not live with her was "not credible." Nothing in Villa's testimony established that Canty[19] actually resided with Mingle for fourteen consecutive days. Villa confirmed that "in the last [ ] two months" he had "seen Ricky Bob Canty on the premises . . . [a]lmost every day," and that he would stay in "the unit that's occupied by Ms. Mingle[.]" But "almost every day[,]" of course, means not every day. All it would take is one day of absence during any fourteen-day period to restart the calculation, preventing

_____

[18] *Id.*

[19] There were conflicting descriptions of Canty: Jesus Villa described him as "tall skinny black guy," around "5'7," between twenty and twenty-two; Mingle described him as a young black man shorter than 5'2," between thirty-four and thirty-five years old. Moreover, Villa also acknowledged that he had never heard the person he believed to be "Ricky Bob" [Canty] introduced or identified by name — another reason casting doubt as to whether Villa and Mingle were discussing the same individual.

Mingle from violating paragraph 3 of the Agreement. Villa's testimony, therefore, was inconclusive.[20]

As to Mingle, while the trial court found her testimony that Canty did not reside with her "not credible," the court's rationale for this determination is, to say the least, puzzling, namely: that this testimony contradicted what she had "falsely stated in writing to a federal agency responsible for supervising Canty that Canty lived with her," so as to "intentionally deceive [CSOSA]." We do not understand how the trial court concluded that Mingle's testimony asserting that Canty did not live with her was contradicted by Mingle's *false* statement to CSOSA that Canty did live with her. Nonetheless, the fact that the trial court found Mingle not to be a credible witness, based on its finding that she "falsely" told CSOSA that Canty lived with her, in no way supports a finding that Canty did live with her for fourteen consecutive days during the period of the Agreement.[21]

---

[20] The fact that Villa saw Canty on the Oak Street premises "[a]lmost every day" is scantier evidence that he resided with Mingle for a period of consecutive days than the evidence of residency that fell short of violating the "guest stay" policy in *Williams*. See text accompanying *supra* note 15.

[21] In light of our rejection of the trial court's finding as to Canty's status as an "unauthorized occupant," we need not enhance Mingle's argument by addressing whether the trial court abused its discretion by failing to consider a Bureau of Prisons form and Canty's criminal docket, both of which were admitted

(continued . . .)

The trial court accordingly failed to provide a sound reason for finding that Canty at any time had resided in Mingle's apartment for at least fourteen consecutive days.[22] The evidence before the trial court in no way was inconsistent with a substantial possibility that Canty visited Mingle frequently while never violating the fourteen day provision of paragraph 3. As we said in *Williams*, "[c]ontacts and connections are simply not sufficient evidence of a guest stay" in violation of specified prohibitions.[23] In sum, because the trial court rested its decision on an unsupportable finding that Canty was an "unauthorized occupant" of Mingle's premises whom Mingle did not expel, as required by the Agreement, the resulting judgment was "plainly wrong," without the requisite evidentiary support. [24]

_____

(. . . continued)
in evidence and indicated that Canty was in prison for a portion of the period relevant here.

[22] *See Williams*, 213 A.3d at 1281.

[23] *Id.*

[24] *Davis*, 564 A.2d at 35 (quoting D.C. Code § 17-305(a)).

Finally, because we conclude that the evidence presented was insufficient to support the trial court's ruling that Mingle violated the Agreement, we need not consider the other issues raised by the parties, aside from mentioning a confusing, but irrelevant, trial court reference to Mingle's lease.[25]

\*\*\*\*\*

For the foregoing reasons, we vacate the stay, reverse the judgment of the trial court, and enter judgment for appellant Mingle.

*So ordered.*

_____

[25] In its Findings of Fact, Conclusions of Law, and Order, the trial court observed, sua sponte, that the "lease," as well as the "settlement agreement," imposed on Mingle a "continuing obligation to not allow unauthorized occupants as defined in the lease and settlement agreement to reside in her unit." In derogation of the statement, however, the parties agree: the lease "is irrelevant" (Mingle); "the only agreement at issue . . . is the Settlement Agreement" (Oak Street). Mingle points out, correctly, that paragraph 5 of the Agreement allows Oak Street to file a motion for non-redeemable judgment only in the event of a breach of a requirement in paragraph 1, 2, or 3 of the Agreement, none of which reflects language in Mingle's lease. Nor did Oak Street allege a violation of the lease. Finally, the trial court announced no reason for mentioning the lease, and we perceive no reliance on it in the court's analysis.

FERREN, *Senior Judge*, concurring: Although I join the opinion for the court, I believe that appellant Mingle's first argument, based strictly on sound principles of contract interpretation, is the better way to address this appeal, without need to resolve the relevance, credibility, and sufficiency of testimonial and other evidence at the evidentiary hearing.

The parties' Agreement was filed on May 14, 2018. Mingle argues that paragraph 3 is unambiguous; it simply requires her — within seven days of the filing of the Agreement (on or before May 21, 2018) — to remove all "unauthorized occupants," defined as occupants "residing in the premises for 14 consecutive days."[1] Mingle stresses that paragraph 3 specifies no continuing obligation, beyond those seven days, to remove other unauthorized occupants during the eighteen month period of the Agreement (ending November 14, 2019).

---

[1] Paragraph 3 of the Agreement provides in full:

> Defendant shall remove all unauthorized occupants within seven days of filing this Settlement Agreement. Defendant represents that she understands that an unauthorized occupant is any person who is residing in the premises for 14 consecutive days.

Oak Street argues, to the contrary, that the trial court correctly ruled that paragraph 3 does impose a continuing obligation to remove all unauthorized occupants from the apartment for the lifetime of the Agreement.  Oak Street relies primarily on the argument that, when paragraph 3 is read in conjunction with paragraphs 4 and 5 of the Agreement,[2] the three paragraphs, taken together, clearly establish that Mingle's paragraph 3 duty to remove unauthorized occupants lasted eighteen months — the lifetime of the Agreement.

I agree with appellant Mingle.  The plain language of paragraph 3 is simple, straightforward, and clear:[3] Mingle has a duty to remove all unauthorized

_____

[2] Paragraph 4 of the Agreement provides:

Defendant, her household members, guests, and invitees shall comply with the terms of paragraphs 1 through 3 for the period of eighteen months upon filing this Settlement Agreement.

Paragraph 5 of the Agreement provides:

> In the event that Defendant, her household members, guests, and invitees breach any terms in paragraph 1 through 3 within eighteen months of filing this Settlement Agreement, Plaintiff shall be entitled to file a motion for a nonredeemable judgment for possession with notice to Defendant in accordance with the rules of this Court.

[3] If a provision is unambiguous, we "adhere[] to an objective law of contracts, meaning that 'the written language embodying the terms of an
(continued . . .)

occupants within seven days of the filing of the Agreement. This means that Mingle would have violated the Agreement if — and only if — on May 22, 2018, the eighth day after the Agreement was filed, she had a resident in her apartment who had lived there for at least fourteen consecutive days. It is therefore clear, at least from the language of paragraph 3 alone, that Mingle had no continuing obligation to remove unauthorized occupants after May 21, 2018. Recognizing, however, that we must "construe the contract as a whole, giving effect to each of its provisions, where possible[,]"[4] I focus next on paragraphs 4 and 5.

I understand Oak Street to contend that after (1) defining "unauthorized occupant" in paragraph 3, then (2) requiring compliance by Mingle *and her guests and invitees* with paragraphs "1 through 3" via paragraph 4, and, finally, (3) extending enforceability under paragraph 5 to any time "within 18 months of [its] filing," the Agreement can "only be reasonably interpreted" one way: that Mingle

_____

(. . . continued)

agreement will govern the rights and liabilities of the parties [regardless] of the intent of the parties at the time they entered into the contract." *Dyer v. Bilaal*, 983 A.2d 349, 55 (D.C. 2009) (internal quotation marks omitted). In other words, "[c]ontracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction." *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. 1983).

[4] *Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291, 303 (D.C. 2006).

must remove all unauthorized occupants from (or unauthorized occupants must vacate) the premises (immediately after the fourteenth day of occupancy) during the Agreement's entire lifetime. Oak Street's interpretation of the three paragraphs at issue, however, ignores a fundamental rule of construction rooted in their plain language and adds obligations for Mingle that have no basis in the text of the Agreement.

Clearly, paragraph 5 in no way interferes with the plain reading (non-continuing nature) of paragraph 3. All paragraph 5 does is establish that, if Mingle (or "her household members, guests, and invitees")[5] were to "breach any term[]" in the Agreement, Oak Street has the right to pursue a "non-redeemable judgment for possession" at any time within eighteen months of its filing, not necessarily immediately. Therefore, although paragraph 3 required Mingle to remove all occupants who were "unauthorized" as of the seventh day from the date the Agreement was filed, paragraph 5 granted Oak Street eighteen months within which to rectify that breach by filing a motion for repossession of the property.

_____

[5] Although paragraph 5 refers to a possible breach by Mingle, "her household members, guests, and invitees" of any terms in paragraph 1 through 3, only Mingle (the tenant) and Oak Street (the landlord) can breach a term of the Agreement. The presence of these other individuals on the premises can be a cause of the tenant-appellant's breach.

Thus, there is nothing inherently contradictory or otherwise ambiguous about paragraphs 3 and 5 when read together; no evidence outside the contract language is required to discern its plain meaning that distinguishes the periods of breach and enforcement.[6]

Finally, there is paragraph 4 of the Agreement, which directed Mingle to comply with paragraphs "1 through 3" over a "period of eighteen months" from the date the Agreement was filed.

Rather than setting out a new obligation, paragraph 4 of the Agreement requires Mingle to comply with paragraphs 1 through 3, and, as stated above, paragraph 3 plainly, i.e., explicitly, requires appellant to remove all unauthorized occupants within seven days of the filing of the Agreement, namely by May 22, 2018, and none later. By itself, therefore, paragraph 3 is not a continuing obligation. Contrast this with paragraph 1, requiring Mingle and her guests not "to allow large amounts of traffic to and from the apartment to interfere with other

_____

[6] "In determining whether a contract is ambiguous, we examine the document on its face, giving the language its plain meaning." *Tillery v. District of Colombia Contract Appeals Bd.*, 912 A.2d. 1169, 1176 (D.C. 1990). "Ambiguity exists only if the court determines that the proper interpretation of the contract cannot be derived from the contractual language exclusively, and requires consideration of evidence outside the contract itself." *Steele Founds., Inc. v. Clark Const. Grp., Inc.*, 937 A.2d 148, 153 (D.C. 2007).

residents' use and quiet enjoyment of the property," and with paragraph 2, forbidding Mingle and her guests from "engag[ing] in any criminal activity that endangers the health, safety, and welfare of other residents" — both continuing obligations. Clearly the parties knew how to write provisions that include ongoing obligations and chose not to do so in paragraph 3.[7]

While it may make little, if any, sense for a landlord to agree to paragraph 3 when all it imposed upon a tenant was the obligation to remove unauthorized occupants for a period of seven days, this does not change the fact that the language of paragraph 3 is clear and thus represents what the parties agreed to. "When construing a contract, a court must honor the intentions of the parties as reflected in the settled usage of the terms they accepted in the contract, and will not "torture words to import ambiguity where the ordinary meaning leaves

_____

[7] *See Wilson v. Hayes*, 77 A.3d 392, 402-03 (D.C. 2013) (concluding that plain language in settlement agreement made clear that parties chose not to condition father's obligation to pay for children's secondary school on his consent to choice of school, as such consent — a condition included in separate provision governing father's obligation to finance college — was not included in secondary school provision, thereby showing that parties "could have negotiated a similar condition regarding secondary schools" but chose not to do so); *cf., BSA 77 P St. LLC v. Hawkins*, 983 A.2d 988, 999 (D.C. 2009) (explaining that when local legislature used language to mandate particular result, this "suggests that the Council — when it meant to do so — knew how to phrase the statute to assure" compliance with its objectives).

no room for ambiguity."[8]  This is especially true when, as here, both parties had counsel and averred that they "carefully read and understood the terms and contents" of the Agreement.

Oak Street attempts to explain away the plain language of paragraph 3 that conflicts with its interpretation of paragraph 4 by acknowledging that, although the Agreement "could have been clearer," the first sentence of paragraph 3 actually meant that Mingle was required to "remove any *existing* unauthorized occupants within seven days of the filing of the Agreement" (emphasis added).  Assuming, we were to accept this interpretation, paragraph 3 would still fail to impose an affirmative obligation on Mingle to expel persons who became "unauthorized occupants" after May 21, 2018.  Language reinforcing paragraph 3's requirement that Mingle "remove all [existing] unauthorized occupants" by May 21, 2018, does not necessarily imply an extended obligation to remove all other unauthorized occupants until November 19, 2019.[9]

---

[8] *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1064 (D.C. 2008) (internal quotation marks omitted).

[9] Oak Street — or even both parties — may have intended that paragraph 3 should be interpreted to require Mingle to remove all existing unauthorized occupants within seven days of the filing of the Agreement and, in addition, to require removal of all future unauthorized occupants during the eighteen month period of the Agreement.  However, "a party's unexpressed intent is irrelevant if a

(continued . . .)

Oak Street asserts, nonetheless, that the provisions that follow paragraph 3 (specifically paragraphs 4 and 5) "*unambiguously* required [appellant] not to have any unauthorized occupants in her unit for the entire term of the agreement" (emphasis added).  In derogation of that assertion, however — and expressly admitting "some degree of uncertainty" — Oak Street relies exclusively on "common sense and logic" (certainly not evidence or the plain meaning of the language) to fill in for what it claims is missing language.[10]  Then, to elaborate the

_____

(. . . continued)
contract is unambiguous." *Dyer*, 983 A.2d at 355 (quoting *DSP Venture Group, Inc. v. Allen*, 830 A.2d 850, 852 (D.C. 2003)).  Furthermore, there is nothing on the face of the Agreement, let alone in the law, that supports the argument that the court should simply read in the additional language necessary to achieve Oak Street's subjectively intended result.

[10] Quoting our decision in *EastBanc v. Georgetown Park Assocs*., 940 A.2d 996, 1002 (D.C. 2008), Oak Street argues that the terms of a contract "'need not be fixed with complete and perfect certainty for a contract to [be enforceable].'" *EastBanc*, however, goes on to say that "[a] contract is enforceable if it is sufficiently definite so that the parties can be reasonably certain as to how they are to perform[,]" and that "the terms of the contract [must be] clear enough for the court to determine whether a breach has occurred and to identify an appropriate remedy." *Id.* (internal quotations omitted).  In the present case, the plain language of paragraph 3 is sufficiently clear for the parties to know how to perform, and thus the court is not left wondering whether a breach has occurred.  Clearly, Mingle would have breached paragraph 3 if she had failed to remove unauthorized occupants within seven days of the filing of the Agreement, and Oak Street's remedy is a non-redeemable judgment for possession.  For paragraph 3 to make sense and be enforceable, therefore, a court need not accept Oak Street's proposal to equalize the time period for a *breach* with the longer time period for *enforcement* in paragraph 5.  Oak Street's interpretation of paragraph 3, therefore, in no way is supported by the text of the parties' Agreement, and this court "will
(continued . . .)

point, Oak Street observes that paragraph 4 of the Agreement requires Mingle to "comply with the terms of paragraphs 1 through 3 *for the period of eighteen months* upon filing this Settlement Agreement." This catch-all provision, however, directed at the substantive provisions requiring Mingle's compliance (paragraphs 1 through 3), does not extend the seven-day compliance period in paragraph 3; it merely expresses the actual time within which all obligations must be fulfilled, including both the fixed, seven-day removal specified in paragraph 3 and the continuing obligations specified in paragraphs 1 and 2.[11] Again, this reading is consistent with the plain language of all the related provisions; and, unlike Oak Street's interpretation, it does not require the court to "torture words . . . where the ordinary meaning leaves no room for ambiguity."[12]

---

(. . . continued)
not impose additional requirements above those that the parties negotiated themselves." *Wilson*, 77 A.3d at 402.

[11] *See Wilson*, 77 A.3d at 402 (concluding that, because father's obligation under settlement agreement "to pay for the children's private school education [was] clear and complete," the mother's and father's joint obligation "to share decision-making about the education, health, and general welfare of the children" could not be read to condition the father's financial obligation on a right to consent to the school his daughter will attend; while the court must interpret a contract as a whole, "giving effective meaning to all its terms," this "does not permit us to read one provision of a contract as altering the plain meaning of another").

[12] *Fort Lincoln Civic Ass'n, Inc.*, 944 A.2d at 1064 (internal quotation marks omitted).

Because I conclude that the Agreement is unambiguous, and that the plain language of paragraph 3 cannot be read to impose a continuing obligation to remove unauthorized occupants beyond the seven-day period specified, Mingle would not have violated paragraph 3 of the Agreement unless she failed to remove an unauthorized occupant by May 21, 2018. Oak Street, however, has never alleged such a breach.

*****

For the foregoing reasons, in addition to those in the alternative disposition in the majority opinion, I would reverse the judgment of the trial court and enter judgment for appellant Mingle.